632 April 9, 2025 No. 322

*This is a nonprecedential memorandum opinion pursuant to ORAP 10.30 and may not be cited except as provided in ORAP 10.30(1).*

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

A. V. V.
*Petitioner-Respondent,*

*v.*

JEFFREY BRYON SPERLA,
*Respondent-Appellant.*

Lane County Circuit Court
23PO13600; A183291

Kamala H. Shugar, Judge.

Submitted February 18, 2025.

Jason E. Thompson and Thompson Law, LLC, filed the brief for appellant.

A. V. V. filed the brief *pro se*.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

AOYAGI, P. J.

Reversed.

**AOYAGI, P. J.**

Respondent appeals a restraining order issued against him under the Family Abuse Prevention Act (FAPA). *See* ORS 107.700 - 107.735. As described below, we conclude that the evidence at the contested hearing was legally insufficient to establish that respondent represented a credible threat to petitioner's physical safety and that it was therefore error to continue the restraining order. That conclusion obviates the need to address respondent's other assignments of error. Accordingly, we reverse.

*Facts.* We are bound by the trial court's express and implied factual findings if there is evidence in the record to support them. *J. E. -S. v. Shields*, 332 Or App 226, 227, 548 P3d 862 (2024). We state the facts accordingly. Because the trial court found petitioner generally credible and respondent generally not credible, we limit our description of the facts to petitioner's testimony.

The parties dated for five years—from September 2018 to November 2023—and have a baby. The three of them lived together in a house owned by respondent. Petitioner stayed at home and had no income. During the relationship, respondent was "not often" controlling but would be "every once in a while," and "when he wanted to be heard, he made it known that [petitioner] needed to listen to him." When asked how specifically he was controlling, petitioner stated that he was "financially controlling" in the sense that he "never wanted to give [her] money other than for [her] monthly expenses" and reviewed the charges on the credit cards that he gave her. He also controlled how many times a year she travelled to Bakersfield to visit her family; in the last year that they were together, she went six times, which cost about $800 per trip.

The parties ended their relationship in November 2023. Respondent moved out of the house on November 25. The next day, respondent came to the house and said that they needed to talk. Petitioner had just returned from a trip and did not want to talk, but respondent followed her around the house and insisted that they talk. He stood in the way when she tried to go upstairs. He eventually let her

pass but followed her upstairs. Petitioner went into the bedroom and started to close the door, but respondent "pushed it into [her]." Petitioner asked, "Did you just throw the door against me?" Respondent responded, "You need to calm the F down, I'm not touching you." Petitioner tried again to close the door, "and he hit it back into [her] several times." It did not hurt, but it scared her. Petitioner said, "You need to stop, you're scaring me." Respondent said, "You need to calm the F down." Petitioner "asked him to just wait downstairs," and respondent said he would give her "ten minutes to get [her] S together and then [she] would have to go sit on the effing couch and listen to what he had to say."

A week later, on December 2, respondent came to the house to pick up his Peloton bike. It started raining, so he backed his vehicle toward the garage to load the bike from there, but he accidentally left the hatch up, which crashed into the garage door, damaging his vehicle. Petitioner heard the crash, followed by respondent yelling and cussing, and it scared her that he was so "angry and aggressive." She grabbed the baby to go upstairs. Respondent came inside and yelled the F word twice from two feet away, which made the baby cry.

During the two weeks after they broke up, the parties did not have a clear plan for the future in terms of living arrangements, parenting arrangements, or financial matters. Respondent had gone back and forth about whether petitioner could stay in the house or whether he was going to sell it. He told her multiple times during that two-week period, "I can make things so much worse for you, you could have it so much worse, I can make things so ugly[,] I can make things very hard for you." Asked if respondent was alluding to finances, petitioner testified that she did not know what he was alluding to but felt threatened by those statements.[1] Petitioner moved out of the house after two weeks. She had nowhere to go, so she went to a domestic violence shelter.

_____

[1] Petitioner also testified that, once, during an argument, respondent, who is a psychiatric nurse practitioner, told her that he knew "exactly what to say to have somebody put into a psychiatric hold." It is unclear when that statement was made. At the time, petitioner did not perceive it to be directed toward her but, later, looking back, thought it was a veiled threat to have her committed.

On December 8, petitioner initiated a FAPA proceeding. The trial court held an *ex parte* hearing and issued a FAPA restraining order. It was a few days before the sheriff's office served the order on respondent. Before it was served, respondent repeatedly called and texted petitioner, stating that they needed to talk and that he needed to know where she was. He also tried to locate her through friends and family. Petitioner responded by text that she and the baby were safe and that she would send photos and updates about the baby. After not hearing from petitioner for 24 hours, respondent filed a missing-person report with the police on December 10.

On December 18, the court held a contested FAPA hearing. Petitioner testified as described above. She further testified that she was scared for her physical safety because respondent was "so unpredictable" and that he could "try to get some kind of revenge" absent a restraining order. Petitioner confirmed on cross-examination that she had never before claimed threats or abuse by respondent and that the restraining order was based entirely on the events since their breakup. Petitioner described respondent's behavior since the breakup as "so different, so erratic, and so violent." An example of "erratic" behavior was that he told her she could stay in the house but then a realtor came to start the sales process, and the realtor thought she had already found an apartment.

The trial court continued the FAPA restraining order. It found petitioner's testimony credible and believable, including finding that petitioner was "visibly afraid and shaken" while testifying. The court discredited respondent's testimony, including finding that respondent, who appeared *pro se*, "was emotionally reactive and even aggressive during court proceedings, including erratic and, in his own words, unhinged."[2] The court found that respondent had abused petitioner in the preceding 180 days by "recklessly" placing

---

[2] Based on the transcript, the finding that respondent was "emotionally reactive and even aggressive during court proceedings, including erratic," must refer to his tone while representing himself and/or testifying, as it is not apparent from his words. As for the "unhinged" reference, respondent testified that the breakup was "a very stressful and emotionally draining process" and, early in his closing argument, apologized to the court if he "seem[ed] a little unhinged today" and referred to his emotions.

her "in fear of imminent serious bodily injury, imminent bodily injury." The court further found that petitioner reasonably fears future abuse "based upon [r]espondent's incessant efforts to find her after she fled to a domestic violence shelter" and that respondent represents a credible threat to petitioner's physical safety.[3]

*Analysis.* To continue the FAPA restraining order, the court had to find that (1) abuse had occurred in the preceding 180 days, (2) petitioner reasonably fears for her physical safety, and (3) respondent represents a credible threat to petitioner's physical safety. ORS 107.716(3)(a). Respondent argues that the evidence was legally insufficient to prove the third requirement. We review for legal error. *J. E. -S.*, 332 Or App at 227.

In assessing whether a respondent represents a credible threat to a FAPA petitioner's physical safety, an "overt threat of physical violence is not required," and the court may consider events outside the 180-day window. *J. K. v. Kargol*, 295 Or App 529, 533, 435 P3d 814 (2019). In this case, there was no evidence of any physical or verbal abuse prior to November 26, 2023, and in fact petitioner's own testimony indicates that there was none. The question, then, is whether respondent's conduct between November 26 and December 10, as described above, was legally sufficient to establish that respondent represents a credible threat to petitioner's physical safety.

It was not, and the trial court erred in concluding otherwise. On November 26, respondent pushed the bedroom door into petitioner several times to prevent her from closing it, which petitioner testified did not hurt. There was no evidence of any other abuse, nor was there evidence of any overt or implied threats of physical violence. On this record, the two incidents on November 26 and December 2 were insufficient

---

[3] To be precise, the court stated that respondent "represents a credible threat to the physical safety of Petitioner or Petitioner's children." We understand that to reference the statutory criteria, ORS 107.716(3)(a)(C), not as a finding regarding the parties' baby. We do not understand petitioner to have claimed any threat to the baby's physical safety, nor would the record support such a finding. The only evidence as to the baby was that she slept through the November 26 incident and that she started crying on December 2 when respondent said the F word loudly twice from two feet away.

to prove a credible threat to petitioner's physical safety. *Compare J. E. -S.*, 332 Or App at 229 (the respondent posed a credible threat to the petitioner's physical safety where there had been at least two physical incidents during fights over the respondent's immigration status, and the immigration issues "were ongoing after the parties separated and were exacerbated by the parties' pending divorce"); *and N. F. M. v. Khalidi*, 315 Or App 668, 672, 503 P3d 468 (2021), *rev den*, 369 Or 504 (2022) (the respondent posed a credible threat to the petitioner's physical safety where there was a history of physical abuse, threats of violence, and a violation of the *ex parte* FAPA order); *with K. L. D. v. Daley*, 280 Or App 448, 453-54, 380 P3d 1226 (2016) (the evidence was insufficient to prove a credible threat to the petitioner's physical safety, where there was no history of violence or threats in the relationship, and threats during the breakup relating to finances and child custody were not threats to "physical safety"); *and C. J. P. v. Lempea*, 251 Or App 656, 658-59, 284 P3d 1212 (2012) (evidence that the respondent had "squished" the petitioner in a doorway, owned weapons, and had gone to the petitioner's home to remove items was insufficient to establish a credible threat to the petitioner's physical safety).

Reversed.